**AFFIDAVIT OF MATTHEW R. ZAREMBA IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS FOR TARGET MOBILE PHONE 1 AND TARGET VEHICLE 5**

I, Matthew R. Zaremba, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I have been a Special Agent with the FBI since 2006.  I am currently assigned to the Boston Field Office, Lowell Resident Agency.  I am assigned to work Counterterrorism and Criminal matters to include investigations focused on transnational organized crime, threats to life, violent gangs, drug trafficking, and violent crimes against children.  Prior to my current assignment I was assigned to FBI Headquarters' where I worked joint overseas investigations related to threats against the United States to include kidnappings, murders, terrorist plots and attacks.  I have also worked on a Combined Joint Interagency Task Force, served as an Assistant Legal Attaché in South Africa, and worked on the FBI's Joint Terrorism Task Force in Boston, MA.

2.      As an FBI Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), heroin, fentanyl, methamphetamine, oxycodone, and other controlled substances that are, by themselves, illegal to possess.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in their trade.

3.      I have participated in various aspects of drug-related investigations.  I have participated in controlled purchases of controlled substances utilizing confidential sources and

undercover law enforcement agents and officers.  I have prepared affidavits in support of

applications for criminal complaints, search warrants, and/or arrest warrants.  I have also

conducted and coordinated electronic and physical surveillance of individuals involved in the

illegal distribution of controlled substances.

4.     Through my training and experience, I have become familiar with the manner in

which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how

they collect and launder drug proceeds. I am familiar with the manners and methods by which

narcotics trafficker's package and prepare narcotics for transportation and distribution, their

methods of operation, and security measures which are often employed by narcotics traffickers

to avoid vulnerability to law enforcement and to other drug dealers who might attempt to steal

their narcotics, their profits, and/or their customers. I am also familiar with the manner in which

narcotics traffickers use telephones, cellular telephone technology, coded communications or

slang-filled telephone conversations, false or fictitious identities, and other means to facilitate

their illegal activities and thwart law enforcement investigations.

5.     Based on my training and experience, I am also familiar with the manner in which

narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they

collect and launder drug proceeds. Based on my training and experience, I am familiar with

narcotics traffickers' methods of operation, including methods used by them to distribute, store,

and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.

I am also familiar with the manner in which narcotics traffickers use personal, borrowed, and

rented cars and trucks, common carriers, mail and private delivery services, and a variety of

other motor vehicles to: (a) meet with co-conspirators, customers and suppliers; (b) transport,

distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d)

transport the proceeds of narcotics transactions. I am aware that drug traffickers often transport

drugs and drug proceeds in motor vehicles, and that drug traffickers often use their vehicles to meet with other co-conspirators, including their sources of supply and/or their drug customers, and to travel to and from the residences of co-conspirators and storage sites for drugs and drug proceeds. Drug traffickers also use their vehicles to go to banks and other financial institutions to deposit drug proceeds and/or transfer funds to purchase drugs. Experienced drug traffickers will often engage in counter-surveillance maneuvers while driving an automobile in an attempt both to determine whether they are being followed by law enforcement and to evade any law enforcement officers who may be conducting surveillance. I am also aware, from my training and experience, that drug traffickers often install and use electronically operated hidden compartments in motor vehicles to conceal large quantities of drugs and drug proceeds.

6.     More broadly, based upon my training and experience, I know that tracking drug traffickers (in motor vehicles and otherwise) frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

7.     The conclusions and opinions set forth below are based on my experience and training, my participation in this investigation, and conversations with other law enforcement officers who are familiar with the facts and circumstances of this investigation.  Throughout this Affidavit, statements that "I know" and "I believe" certain facts are based upon this combination.

## REQUEST FOR ISSUANCE OF WARRANTS

7.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the mobile phone assigned 978-996-3292 (the "Target Mobile Phone"), the subscriber to which is Sareth Yut, 58 Midland Street, Lowell, MA 01851, and that is believed to belong to SARATH YUT.  The service provider for this phone is T-Mobile USA, Inc., ("T-Mobile") a wireless telephone service provider that accepts service of process at 4 Sylvan Road, Parsippany, New Jersey.  The Target Mobile Phone is further described in Attachment A, and the location information to be seized is further described in Attachment B.

8.      I also make this affidavit in support of an application for an Order, pursuant to Federal Rule of Criminal Procedure 41(e)(2)(C) and Title 18, United States Code, Section 3117, authorizing agents of the Federal Bureau of Investigation (FBI), IRS-Criminal Investigation (IRS-CI), the United States Postal Inspection Service (USPIS) and the Lowell Police Department surreptitiously to monitor, repair, replace, and use a real-time Global Positioning System ("GPS") mobile tracking device for 45 days on the following motor vehicle located in the District of Massachusetts (hereinafter, the "TARGET VEHICLE 5") for the purpose of monitoring and recording data regarding the movement of this motor vehicle both inside and outside the District of Massachusetts:

A black 2008 Chevrolet Silverado pickup truck, bearing Massachusetts registration 1ZNX61, vehicle identification number (VIN) 1GCHK29K38E149756, registered to SARITH KONG, 58 Midland St, Lowell, MA.[1]

9.      Based on the facts set forth in this affidavit, there is probable cause to believe that SARATH YUT and others have violated 21 U.S.C. §§ 841(a)(1) (possession with intent to

---

[1] As described below, I believe that YUT is the actual operator of this vehicle.

distribute and distribution of controlled substances) and 846 (conspiracy to possess with intent to distribute and to distribute controlled substances) and 18 U.S.C. § 1956(h) (money laundering conspiracy) (hereinafter, the "Target Offenses").  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these crimes and will lead to the identification and location of those who committed them

10.     Based on the investigation to date, I believe that the TARGET VEHICLE 5 is being used by YUT to acquire narcotics from sources of supply and proceeds of narcotics sales and to transport narcotics and proceeds of narcotics sales.  As further described below, there is probable cause to believe that: (a) YUT has committed, is committing, and will continue to commit one or more of the TARGET OFFENSES; (b) the TARGET VEHICLE 5 is being used and will continue to be used to facilitate the commission of the TARGET OFFENSES; and (c) the data obtained from the GPS device about the geographic location of the TARGET VEHICLE 3 will constitute and/or will lead to evidence, fruits, and instrumentalities of the TARGET OFFENSES as well as to the identification of the individuals who are committing those and related crimes.  There is also probable cause to believe that the TARGET VEHICLE 5 is an instrumentality of the TARGET OFFENSES in that it is being used in committing one or more of the TARGET OFFENSES.

11.     I submit this affidavit for the limited purpose of establishing probable cause for the requested warrants.  Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation; facts not presented herein are not relied on as the basis for this request.

## BACKGROUND OF INVESTIGATION

12.     On September 11, 2019, the Court issued a search warrant for location information for the Target Mobile Phone.  Case No. 19-MJ-1264-DLC.  I hereby incorporate by

reference the affidavit submitted in support of that application (hereinafter, "Zaremba September 11, 2019 Affidavit").

13. On October 4, 2019, the Court issued a "sneak and peek" search warrant for a USPS Priority Mail Express package, bearing tracking number EJ120562507US. Case No. 19MJ-6437-MPK. I hereby incorporate by reference the affidavit submitted in support of that application (hereinafter, "Sackett October 4, 2019 Affidavit").

14. On October 10, 2019, the Court issued search warrants for location information for the Target Mobile Phone and for the installation and use of a GPS mobile tracking device for a blue 2005 Dodge Ram pickup truck, bearing Massachusetts registration 2DL396, vehicle identification number (VIN) 1D7HU18N25S247048, registered to Sreymom SUONG, 71 Corbett Street, Lowell, Massachusetts (formerly the "TARGET VEHICLE"). Case No. 19-MJ1269-DLC and 1270-DLC. I hereby incorporate by reference the affidavit submitted in support of those applications (hereinafter, "Zaremba October 10, 2019 Affidavit").

15. On November 25, 2019, the Court issued search warrants for location information for the Target Mobile Phone and for the continued use of a GPS mobile tracking device for the TARGET VEHICLE. Case Nos. 19-MJ-1426-DLC and 1427-DLC. I hereby incorporate by reference the affidavit submitted in support of those applications (hereinafter, "Conway November 25, 2019 Affidavit").

16. On December 20, 2019, the Court issued search warrants for location information for the Target Mobile Phone and for the initial use of a GPS mobile tracking device for a black 1998 Honda Civic sedan, bearing Massachusetts registration 1RCR67, vehicle identification number (VIN) 1HGEJ825XWL062153, registered to SARATH YUT, 58 Midland St, Lowell, MA (hereinafter, "TARGET VEHICLE 2"). Case Nos. 19-MJ-1456-DLC and 1457-DLC. I

hereby incorporate by reference the affidavit submitted in support of those applications

(hereinafter, "Conway December 20, 2019 Affidavit").

17.     On February 5, 2020, the Court issued search warrants for location information

for the Target Mobile Phone and a second use of a GPS mobile tracking device for the

TARGET VEHICLE 2.  Case Nos. 20-MJ-1012-DLC and 1014-DLC.  I hereby incorporate by

reference the affidavit submitted in support of those applications (hereinafter, "Zaremba

February 5, 2020 Affidavit").

18.     Finally, as described below, the Court, as well as the United States District Court

for the District of New Hampshire, issued a series of search warrants on United States Postal

Service packages sent by and to YUT, which are described below.

19.     As further described herein, YUT now drives TARGET VEHILCE 3 as his

primary vehicle.  I also believe that YUT continues to use the Target Mobile Phone[2].

## PROBABLE CAUSE

20.     Previous affidavits described the commission of the TARGET OFFENSES by

YUT and others, including the following specific acts:

21.     On May 9, 2019, an FBI cooperating witness (hereinafter, CW-3)[3] made a

controlled purchase of approximately 62 grams of Cocaine from SAMBO BUTH, a known CMF

---

[2] On April 11, 2020 YUT mailed a package from Chelmsford Post Office to 4118 Hathaway Ave, Long Bach, CA
and was delivered on April 15, 2020.  Subpoena results from T-Mobile identified TARGET PHONE 1 as attributed
to the IP addresses tracking that package on April 14, 2020
[3] Between May 2019 and August 2019, CW-3 made six consensually monitored controlled purchases of illegal
narcotics, including cocaine, fentanyl and heroin, and one consensually monitored purchase of illegal narcotics and a
firearm from SAMBO BUTH.  CW-3 is facing state charges and is cooperating in the anticipation of a
recommendation for more lenient treatment.  CW-3 has also been paid by the FBI for providing assistance. CW-3
has criminal convictions including illegal firearms possession, home invasions, and witness intimidation. CW-3 has
provided information and assistance which has led to search and arrest warrants and I am not aware of CW-3
providing information that was found to be unreliable.  I believe that the information provided by CW-3 in this
investigation is accurate because of CW-3's record for reliability and because of the use of consensual recordings for
corroboration.

member,[4] which I believe were supplied by YUT. *See* Zaremba October 10, 2019 Affidavit at ¶ 19.

22.     On August 29, 2019, YUT distributed approximately two pounds of marijuana to GERSON MANZUETA from the Tanner Street location. *See* Zaremba September 11, 2019 Affidavit, ¶¶ 36-38.

23.     YUT frequently sent packages to California, which were consistent with drug dealing and money laundering. *See* Sackett October 4, 2019, ¶¶ 26-47. On October 4, 2019, YUT mailed a package which was intercepted by United States Postal Inspectors and searched pursuant to a search warrant. The package contained three individual stacks of unknown items, similar in consistency to stacks of money, which I believe were the proceeds of illegal drug sales, which YUT attempted to conceal because of their illegal nature.[5] *See* Zaremba October 10, 2019 Affidavit, ¶¶ 23-24.

24.     On October 15, 2019, agents executed a trash pull on a bag of garbage retrieved from YUT, which contained priority mail packaging the name "Jason Chan," which is the alias that YUT regularly uses when sending packages to the West Coast (as described in the Sackett October 4, 2019 Affidavit), and other items consistent with receiving, preparing, re-packaging and distributing drugs, including apparent drug residue. Combined with prior observations of Tanner Street, I believe that YUT is using that location for his illegal drug business. *See* Conway November 25, 2019 Affidavit, ¶¶ 24-25.

---

[4] Prior to the controlled buy, agents searched CW-3 for money or contraband, with negative results, equipped CW-3 with recording and transmitting equipment, and instructed CW-3 to make a purchase of drugs from BUTH. Agents kept CW-3 under surveillance during the transaction, during which CW-3 met with BUTH. Following the transaction, CW-3 met agents at a predetermined location, where they again took custody of the drugs, retrieved the recording and transmitting equipment, and again searched CW-3 with negative results.

[5] Incidentally, YUT specifically described this method in prior phone calls to MAO.

25.     As described in greater detail in the Zaremba September 11, 2019 Affidavit,

¶¶ 13-35, YUT uses the Target Mobile Phone to speak to Michael MAO, an inmate at the

Buckingham Corrections Center, Dillwyn, Virginia, which calls are recorded.  Despite being in

prison, MAO and YUT conspired to distribute controlled substances.

26.     On December 12, 2019, YUT and Peouveasnah PIN aka POE traveled from

Boston to San Jose, California.  According to law enforcement surveillance, Alphonso HUYNH

picked up PIN and YUT at the airport.  As described in the October 4, 2019 Sackett Affidavit,

HUYNH was listed as the recipient for previous packages sent by YUT to San Jose, California.

According to law enforcement surveillance, HUYNH drove slowly on the highway from the

airport to the hotel, where YUT, PIN and HUYNH spent approximately 30 minutes, and then

drove away from the hotel at a high rate of speed, losing the surveillance unit.  I believe that

YUT and PIN brought bulk money with them to pay HUYNH for recent drug shipments because

agents have not seen YUT send an outbound package to HUYNH since November 6, 2019,

which was a break from the previous pattern.  In addition, HUYNH's driving was consistent with

an attempt to avoid being pulled over while the money was in the vehicle; once the money was

likely in the hotel, HUYNH drove in a more normal fashion—in fact, fast enough to lose

surveillance.

27.     During a telephone call on December 15, 2019 at 3:09 pm,[6] YUT asked MAO

about the deal a while back and said he [YUT] just got with his boy again.  YUT also said that he

got about 35 but he will get more (mixed words in Khmer).  I believe, based on prior

conversations between YUT and MAO regarding illegal pill deals, that "35" refers to pills that

---

[6] Unless otherwise specified, all calls between MAO and YUT were in a mix of English and Khmer.  An officer who
is fluent in Khmer and familiar with the voices of MAO and YUT provided draft synopses and translations.

YUT could provide to MAO.[7]  MAO said he has been in the hole for about 45 days and just got

out.  YUT said he is working right now and in San Jose, CA.  MAO asked if YUT stopped by to

see his brother Shame jokingly and YUT said he was too far of a drive away. Peouveasnah PIN

aka POE could be heard in the background talking.  MAO asked who was with YUT, who said

POE.  YUT told MAO to let him know if he was still down for that.  MAO asked YUT how long

had he had it [meaning the drugs] and YUT said recently, about a week before his recent trip

[i.e., the trip to California].  YUT said he would be flying back to Lowell the next day and would

be out and about on Tuesday (i.e., the following day). I believe that YUT referred to activities in

furtherance of his drug business by "working" and that YUT was offering drugs to MAO.

28.     On December 16, 2019, YUT and PIN traveled back from California.

29.     On December 17, 2019, via pole camera, law enforcement observed the following

at 346 Western Avenue, Lowell MA: at 1:28 pm, a green Chevy Suburban arrived and parked;

and at 1:36 pm, the TARGET VEHICLE 2 arrived.  Two men exited the Suburban: an unknown

male through driver's door and Sriphan KEOMANY aka C-PON, who was wearing a black

hoodie, and is a known associate of YUT, through the rear passenger door.  The two men met

with YUT. All three entered 346 Western Avenue.  At 1:56 pm, the three men exited 346

Western Avenue and departed in their respective vehicles.

30.     At 3:00 pm, according to location data for the Target Mobile Phone, the Target

Mobile Phone traveled from the Lowell area to the Worcester area.  Starting at 3:40 pm, law

---

[7] *See*, *e.g.*, Zaremba September 11, 2019 Affidavit, ¶ 18 (August 26, 2018, conversation between YUT and MAO, wherein MAO ordered "100"), ¶ 24 (January 28, 2019, conversation between YUT and MAO, wherein YUT said that he would send 100 that day). More recently, during a call on June 2, 2019, at 8:48 pm, YUT spoke to MAO about shipping him "perc 30s."  Furthermore, according to records from Cashapp (an online payment service), on June 1, 2019, an account belonging to screen name "Michael," which I believe belongs to MAO, paid YUT's account $1,500 under the subject "studio payment," and on June 3, 2019, $500 under the subject "Here is the rest for the studio payment".  I believe that those payments were for the June 2, 2019, drug shipment.

enforcement surveillance observed the following: the TARGET VEHICLE 2 was at 49 Westview Avenue, Worcester, Massachusetts.  At 4:00 pm, a white male driving a grey Toyota, bearing MA Registration 2PX278, arrived at 49 Westview Ave.  The driver entered the residence with a package and then exited the residence without the package and began shoveling the driveway (it had been snowing that day).  At 4:10 pm, two males were outside the residence talking.  A white 2013 Infinity, bearing MA Registration 8CT634, registered to HO HUYNH, 49 Westview Avenue, Worcester, Massachusetts, was parked at the residence throughout the surveillance.[8]  According to electronic surveillance of the Target Mobile Phone, YUT had departed 49 Western Ave by 5:30 pm and travelled toward Lowell.

      31.    Starting at 6:00 pm, law enforcement observed the following: a dark colored Cadillac CTS, with an unknown registration, arrived at 346 Western Avenue.  At 6:09 pm, YUT arrived in the TARGET VEHICLE 2, exited the car carrying a black gym bag, met with an unknown male wearing a blue hoodie and tan pants, and entered the unit with the male.  At 6:18 pm, YUT left 346 Western Avenue, again carrying a black gym bag, with the unknown male wearing a blue hoodie carrying a brown bag.  Both men left.  At 6:29 pm, YUT arrived at 105 Tanner Street in the TARGET VEHICLE 2.  At 105 Tanner Street, YUT manipulated the mailbox and entered the unit.  At 6:31 pm, YUT left the storage unit in the TARGET VEHICLE 2.

---

[8] HO HUYNH was convicted in 2014 and sentenced to 8-10 years  for assault and battery and home invasion. HUYNH was released from custody in May 2019 and is currently on state probation. According to the Massachusetts Department of Corrections, HO HUYNH is a validated member of Tiger Society, an Asian affiliated gang in Worcester.  On September 22, 2019, via pole camera, law enforcement made the following observations at 105 Tanner Street, the location of YUT's stash location: at 7:53 pm, HO HUYNH arrived; YUT and HO HUYNH then entered the unit together; at 8:34 pm, HO HUYNH departed; and at 8:35 pm, YUT departed. According to data from state probation from HO HUYNH's GPS bracelet, his pattern of activity consists of multiple short trips from his residence to multiple other residences and locations in and around the Worcester area.  These trips are consistent in pattern with conducting quick deliveries to and from his residence.

32.     Based on prior practice and the observations on December 17, 2019, I believe that YUT collected money from HO HUYNH, which was likely proceeds of drug distribution.  YUT then brought the money back to his regular stash location at 105 Tanner Street, which was also consistent with his prior practice.

*Recent Sneak and Peek Search Warrants*

33.     On December 19, 2019, YUT mailed two packages from the Tewksbury Post Office, which is located at 175 Main Street, Tewksbury, Massachusetts.  The sender information was listed as Steven SAK 70 Villa Roma Dr #70, Tewksbury, MA 01876, and the packages were addressed to Jenny SAK 1436 Obispo Ave Apt 301 Long Beach 90804; and Kathy SAK 4118 Hathaway Ave Apt 1 Long Beach, 90815.  According to video surveillance, YUT actually mailed both packages, and the addresses are consistent with previous packages mailed by YUT to California.  As a result, I believe that YUT has changed his practice to mailing from the other Post Offices.

34.     On January 6, 2020 at approximately 2:02pm, via pole camera surveillance, YUT was observed entering 105 Tanner Street, which is the location of a stash house.  YUT arrived in the TARGET VEHICLE 2.  Approximately one minute later, YUT left 105 Tanner Street, with packaging material similar in size and description as postal mail parcels.  YUT then removed an item from the trunk of the TARGET VEHICLE 2.  YUT appeared to be packing the mail parcel while seated in his vehicle. YUT then departed in the TARGET VEHCILE 2 at approximately 2:06pm.

35.     According to electronic surveillance of the TARGET VEHCILE 2, YUT traveled to the Tewksbury Post Office.  According to video surveillance inside the Tewksbury Post Office, at 2:40 pm, YUT mailed a package, which bore the tracking number 9505 5110 0158 0006 5799 51, was addressed to "Jenny Seng, 4118 Hathaway Avenue #1, Long Beach, CA

90815", and bore a return address of "Christian Seng, 28 Maplewood Ave, Tewksbury, MA 01876".  These characteristics, particularly the destination address, are also consistent with the other mailings by YUT[9]

36.     On January 6, 2020, the United States District Court for the District of Massachusetts issued another sneak and peek search warrant for that package.  Case No. 20-MJ1000-DLC.  The search warrant revealed $21,000 in US currency and the package was returned to the mail.

37.     According to video from the Tewksbury Post Office, YUT mailed a second smaller package on January 6, 2020.  That package, bearing tracking number 9505 5110 0158 0006 5799 44, was addressed to "Aubrey Seng, 1550 Union Cemetery Rd, Charlotte, VA 23923", and bore a return address of "Christian Seng, 25 Maplewood Ave, Tewksbury, MA 01876".

38.     USPIS intercepted that package in Nashua, New Hampshire, and the package remained in in the custody of USPIS in Manchester, New Hampshire.

39.     On January 10, 2020, the United States District Court for the District of New Hampshire issued a search warrant for that package.  Case No. 20-MJ-10-AJ.  The search warrant resulted in the seizure of 30 grams of MDMA, commonly referred to as Molly, and 37 packets of Buprenorphine.[10]

---

[9] The affidavit by FBI SA Tyler Sackett dated January 6, 2020, submitted in support of the application, included two errors.  The correct tracking number for that Affidavit's Subject Package was actually 9505 5110 0158 0006 5799 51, but was listed as 9605 5110 0158 0006 5799 51; and the return address was actually Christian Seng, 28 Maplewood Ave, Tewksbury, MA 01876, but was listed as Christian Seng, 25 Maplewood Ave, Tewksbury, MA 01876.  The two errors were identified once the mailing label was re-examined.

[10] Buprenorphine, commercially marketed as Suboxone and Subutex, is used in medication-assisted treatment (MAT) to treat Opioid Use Disorder (OUD). Buprenorphine is an opioid partial agonist, which means that, like opioids, it produces effects such as euphoria or respiratory depression at low to moderate doses. With buprenorphine, however, these effects are weaker than full opioid agonists such as heroin and methadone.

40.     On January 9 and 10, 2020, YUT using the Target Mobile Phone had six conversations with MAO, the inmate in Virginia and intended recipient of the package which contained MDMA and Buprenorphine.  In summary, they discussed what happened to the package, which of course had not arrived at its intended destination.  For example, on January 9, 2020 (during their third conversation of the day), MAO said that he was scared and that it was supposed to be there the day before.  MAO also asked what to do and whether to leave the package alone?  YUT said that he used whatever address MAO's man had told him to send it to. They further speculated that the package was late.  I believe that they did not know the location of the package but were likely afraid to ask the Postal Service because they knew that the package contained contraband.  I believe that YUT also continues to use the Target Mobile Phone to conduct his illegal drug trafficking business and, for that reason, likely keeps the Target Mobile Phone with him.

41.     On January 28, 2020, USPIS identified three packages being shipped from California to Lowell, Massachusetts, which match a similar pattern to previous packages.  These three packages all had sequential tracking numbers, have hand written labels and bore postage paid in cash.  One of these packages was addressed to "Amy Tran, 1 Bartlett Ct., Dracut MA", with a sender listed as "Stephanie Menn, 12546 Sinatra St, Cerrito, CA 90703.  Open source research indicates that, although these addresses exist, there are no records of these names associated with them.  Similarly, multiple other packages have been delivered to 1 Bartlett Court over the past several months that follow a similar pattern of legitimate addresses with false

_____

Buprenorphine and all products containing buprenorphine are controlled in Schedule III of the Controlled Substances Act.

names listed.  The two other packages identified by USPIS were being shipped to 28 Dix Street, Lowell, Massachusetts.

42.     On January 29, 2020, USPIS intercepted one of those two latter packages, which was a medium size Priority Mail, Postal Package, bearing the tracking number 9505 5128 5822 0028 2715 52, addressed to OCA Services, 28 Dix St, Lowell, MA, sender T.H. Auto Services, 19020 Norwalk Blvd, Artesia, CA 90701.  Although T.H. Auto Services, 19020 Norwalk Blvd, Artesia, CA 90701 is a legitimate business at that address, it is approximately one mile from 12546 Sinatra St, Cerrito, CA 90703, which is listed as the sending address on the Bartlett Court package described in the paragraph above.  The handwriting also looked similar and they were mailed at the same time; as a result, I believe that all three were mailed by the same sender.

43.     On January 31, 2020, the United States District Court for the District of Massachusetts issued a search warrant for that package.  Case No. 20-MJ-1011-DJC.  On February 3, 2020, the FBI and USPIS executed the search warrant.  That package contained two separate bags containing a total of approximately 899.9 grams of crystal methamphetamine.  A filed test utilizing a TruNarc system was conducted and both bags tested positive for methamphetamine.

*YUT's Use of TARGET VEHICLE 5 In Furtherance of the TARGET OFFENSES*

44.     TARGET VEHICLE 5 is registered to Sarith KONG at 58 Midland Street. KONG is known to LPD as a CMF member and is believed to be the brother of YUT.  58 Midland Street is also the address of YUT's sister, Sareth YUT and an address that YUT has listed on his driver's license.  KONG also has 58 Midland Street, Lowell, MA listed on his driver's license.  The Massachusetts Registry of Motor vehicles indicated that on February 13, 2020, TARGET VEHICLE 5's registration was activated.  On February 13 at 1:20 p.m., TARGET VEHICLE 2 pulled into 346 Western Ave.  YUT exited the driver's side door and

used a key to enter unit 4.  Shortly thereafter the garage door opened and an Unidentified Adult

Male (UAM) exited the front passenger side of TARGET VEHICLE 2.  The UAM appeared to

remove many things from the vehicle and take them inside unit 4.  At 1:43 p.m., the UAM

entered the driver's side door of TARGET VEHICLE 2 and departed 346 Western Ave. At 1:53

p.m., YUT backed TARGET VEHICLE 5 out of the garage bay and into a parking spot. YUT

then walked back into the garage.  At 1:57 p.m., the garage door shut and YUT returned to

TARGET VEHICLE 5 and departed the area.  Since February 13, investigators have observed

YUT consistently driving TARGET VEHICLE 5 and TARGET VEHICLE 5 has been

consistently observed parked at 17 Walker Street, YUT's known residence, during the evening,

overnight, and early morning hours.  As described in more detail below, YUT has used

TARGET VEHICLE 5 in furtherance of TARGET OFFENSES in the same way YUT used

TARGET VEHICLE 1 and TARGET VEHICLE 2.

45.     On February 24, 2020, another undercover employee of the FBI ("UCE2")

conducted a controlled purchase of a quarter kilogram of cocaine from PIN.  During the

transaction, PIN gave the UCE2 a brown paper bag that contained a lightbulb box, which

contained a plastic bag with the suspected cocaine in it.  The UCE gave PIN a white envelope

with $9000 in official agency funds.[11]  Following the transaction, the suspected narcotics were

field tested using a TruNarc and tested positive for cocaine.

46.     Specifically, on February 24, 2020 at approximately, 11:46 a.m., surveillance

observed PIN exit 17 Walker Street, the known residence and stash house of YUT, carrying a

box that resembled the same lightbulb box that PIN gave the UCE.  According to court

authorized electronic surveillance, the TARGET VEHICLE 5 left 17 Walker Street and took a

---

[11] Another FBI UCE who has made several controlled purchases from PIN set up the controlled purchase for UCE 2.

direct and logical route to 438 Butman Road, Lowell, MA.  According to the court authorized electronic surveillance, PIN did not leave his home until, at 12:33 p.m., surveillance observed PIN depart 438 Butman Road in a white Nissan 370Z, MA registration 4VH828 (hereinafter, the "the white Nissan").  At approximately 12:58 p.m., surveillance observed the white Nissan arrive in the vicinity of 70 3rd Avenue, Waltham, MA, where PIN met the UCE and conducted the transaction.  At approximately 1:13 p.m., surveillance observed the white Nissan depart the area of 70 3rd Avenue, Waltham, MA, and travel via a logical route to 37 Greendale Avenue, Lowell, MA, the residence of Virak PRUM, arriving at 1:34 p.m.

47.     On February 25, 2020 at 11:04 a.m., according to pole camera surveillance, a USPS mail van pulled into Bartlett Court in Dracut, MA.  Chomroeun KEO a/k/a "Shrek" exited a brown Lexus, MA Registration 9ZT271 (hereinafter, the "brown Lexus"), which was parked in the driveway of 1 Bartlett Court and walked toward where the mail van drove out of view.  At 11:05 a.m., KEO returned from out of view carrying a large brown box.  KEO briefly set the box down outside of the brown Lexus and then got in the car.  Shortly thereafter, KEO got out of the brown Lexus, picked up the large brown box, and took it inside of 1 Bartlett Court using the rear entrance.  At 4:07 p.m., TARGET VEHICLE 5 arrived at 1 Bartlett Court.  KEO exited the rear door of the residence carrying a large brown box resembling the one he had taken inside.  KEO placed the box inside the passenger side of TARGET VEHICLE 5.  At 4:08 p.m., TARGET VEHILCE 3 departed 1 Bartlett Court.

48.     At 5:05 p.m., surveillance observed TARGET VEHICLE 5 arrive at 17 Walker Street, Lowell, MA (YUT's residence).  Shortly thereafter, YUT exited the driver's door of that vehicle and entered 17 Walker Street carrying a large brown package that appeared to be the same package that was picked up from 1 Bartlett Court.  At 5:33 p.m., PIN entered 17 Walker

Street, Lowell, MA carrying a white envelope resembling the one that the FBI UCE gave to PIN the previous day during the illegal narcotics transaction.

*Sneak and Peak Search Warrant March 3, 2020*

49.     On March 2, 2020, according to electronic surveillance, YUT traveled in the TARGET VEHICLE 5 to the USPS office at Billerica, MA, 460 Boston Road, Billerica, MA. According to a clerk there, YUT mailed a package bearing tracking number EJ 196 408 159 US. The package was addressed to "Justin Lane, 1202 Camino del mar, suite b, Del Mar, CA 92014," and bore a return address of "Christian Seng, 26 Kenmar Dr, #256, Billerica, MA 01821. The characteristics, including the alias "Christian Seng," were consistent with the other mailings described in previous applications. The USPIS intercepted that package.

50.     On March 2, 2020, the court issued a search warrant for the package. Case No. 20-MJ-7019-JCB. Agents executed the search warrant and found $54,000 in U.S. currency within multiple layers of packaging. Agents identified 79 $100 bills with serial numbers matching the OAF used by UCE 2 to conduct the controlled purchase from PIN on February 24, 2020.

51.     Accordingly, I believe that YUT now uses the TARGET VEHICLE 5 as his primary vehicle and uses TARGET VEHICLE 5 to facilitate drug distribution and money laundering and that the location of the TARGET VEHICLE 5 will provide evidence of the Target Offenses. Similarly, I believe that location information for the Target Mobile Telephone will enable investigating agents to locate YUT in possession of the Target Mobile Phone and thereby provide evidence of the Target Offenses.

**AUTHORIZATION REQUEST FOR TARGET MOBILE PHONE**

52.     I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service:  (1) E-911 Phase II data, also known as GPS data or latitude/longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise than E-911 Phase II data.

53.     I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.

54.     I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Mobile Phone on T-Mobile's network, and at such intervals and times as directed by the government.  The government will compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

55.     I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C.

§§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the

subscribers or customers to whom the materials relate) of the existence of this application, the

warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's

Order or upon notice by the government within 30 days of the conclusion of its investigation,

unless the Court extends such period under 18 U.S.C. § 2705(b)  T-Mobile may disclose this

Order to an attorney for T-Mobile for the purpose of receiving legal advice.  Non-disclosure is

appropriate in this case because the Court's Order relates to an ongoing criminal investigation

that is neither public nor known to all of the targets of the investigation, and its disclosure may

alert the targets to the existence of the investigation.  There is accordingly reason to believe that

notification of the existence of the Order will seriously jeopardize the investigation, including by

giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with

evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or

physical safety of an individual.  See 18 U.S.C. § 2705(b).

56.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal

Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay any

required notice until 30 days after the collection authorized by the warrant has been completed.

There is reasonable cause to believe that providing immediate notification of the warrant may

have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the

subscriber or user of the Target Mobile Phone would seriously jeopardize the ongoing

investigation, as such a disclosure would give that person an opportunity to destroy evidence,

change patterns of behavior, notify confederates, and flee from prosecution.  See 18 U.S.C. §

3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the

proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. §

3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  See 18 U.S.C. § 3103a(b)(2).

57.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Mobile Phone outside of daytime hours.

**AUTHORIZATION REQUEST FOR TARGET VEHICLE 5**

58.     It is requested that the Court order surreptitious entry in order to effect the installation, repair, replacement, and removal of the tracking device on the vehicle at any time of day or night, because opportunities during daylight hours to place the tracking device without detection by its owner or others would pose a risk that the overall investigation would be compromised.

59.     The proposed tracking device will use global position systems ("GPS") tracking to determine the location of the TARGET VEHICLE 5 and to record the position at regular intervals in order to create a log of movements that can be viewed in real-time on the Internet with a web browser.

60.     Based on the investigation described above, I believe that TARGET VEHICLE 5 is presently located in the District of Massachusetts, particularly at night.  It is requested that the warrant authorize use of the device to track the movement of the TARGET VEHICLE 5 while the vehicle is located within the District of Massachusetts and also outside of the District of Massachusetts.

61.     It is requested that this warrant authorize the use of the tracking device for a time period not to exceed 45 days from the issuance of this warrant, unless extended by the Court for

good cause, during which time the TARGET VEHICLE 5 can be monitored during daytime and nighttime hours and includes tracking device signals produced from inside private garages and other locations not open to the public or visual surveillance, and signals produced in the event the vehicle leaves the District of Massachusetts but remains within the United States pursuant to Title 18, United States Code, Section 3117.

62.     Title 18, United States Code, Sections (a)(b) (otherwise known as the "Patriot Act") amended Title 18, United States Code, Section 3103a(b) to permit searches with delayed notification. There is reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result. 18 U.S.C. §3103a(b)(1). Providing notice of execution of the warrant to YUT would seriously jeopardize the ongoing investigation, as such a disclosure would give YUT and/or his co-conspirators an opportunity to destroy evidence, change patterns of behavior, notify confederates, and/or flee or continue flight from prosecution. Because immediate notification of the execution of the warrant may have an adverse result as defined at Title 18, United States Code, Section 2705(a)(2), including resulting in flight from prosecution or destruction of or tampering with evidence, and otherwise seriously jeopardizing this investigation, I request that notification be delayed for a reasonable period not to exceed 30 days after use of the tracking device has ended, unless further extended by the Court for good cause. This investigation is ongoing, and it is anticipated that many more search warrants and arrest warrants will be executed in the near future, which i believe could be compromised should the person(s) being tracked under this search warrant be notified of the law enforcement investigation.

## CONCLUSION

63.     I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the

Court, except that the government may produce them in criminal discovery and provide the search warrant for the Target Mobile Phone to T-Mobile and that copies of the Court's Order in full or redacted form may be served on special agents and other investigative and law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the Court's Order. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

///

64.    Therefore, I request that a search warrant be issued to allow for the use and monitoring of a real time Global Positioning System tracking device on the TARGET VEHICLE 5 and recording the location of the TARGET VEHICLE 5 at regular intervals in order to create a log of movements which can be viewed in real-time on the Internet with a web-browser. I further request that the search warrant authorize FBI, IRS-CI agents, USPIS Inspectors or other authorized persons to enter onto private property to effect any needed repair or replacement; allow for the tracking of the movement of the device in the United States, both within and outside of the District of Massachusetts, and in both public and private spaces and other private buildings not otherwise open to the public or open to public view; authorize monitoring for a period of 45 days from the date of issuance of the warrant, unless extended by the Court for good cause; order that notification be delayed for a reasonable period not to exceed 30 days after use of the tracking device has ended, unless further extended by the Court for good cause.

.

/s/ Matthew Zaremba /s/
Matthew R. Zaremba, Special Agent
Federal Bureau of Investigation

Signed electronically and sworn
before me by telephone, this 4th day
of May, 2020.

DONALD L. CABELL
United States Magistrate Judge
District of Massachusetts